UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMARA E. STEPHENS,              :
                                 :
          Plaintiff              :     CIVIL NO. 4:11-CV-00005
                                 :
     vs.                         :     (Judge Conaboy)
                                 :
MICHAEL J. ASTRUE,               :
COMMISSIONER OF SOCIAL           :
SECURITY,                        :
                                 :
          Defendant              :

MEMORANDUM AND ORDER

BACKGROUND

          The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Tamara E. Stephens's claim for supplemental

security income benefits.  For the reasons set forth below we will

affirm the decision of the Commissioner denying Stephens's

application for supplemental security income benefits.

          Supplemental security income (SSI) is a federal income

supplement program funded by general tax revenues (not social

security taxes).  It is designed to help aged, blind or other

disabled individuals who have little or no income.

          Stephens was born in the United States on December 8,

1976. Tr. 99.[1]  Stephens has a limited education. Tr. 44.  She

withdrew from school after completing the 11th grade in 1993. Tr.

_____

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on March 16,
2011.

120.  During her elementary and secondary schooling, Stephens attended regular education classes. Id.  Stephens can read, write, speak and understand the English language. Tr. 113.  Stephens attempted and failed on two occasions to obtain a General Equivalency Diploma. Tr. 26.

Stephens has a very limited work and earnings history. Tr. 115.  Her employment history consists of working as a cashier, packer, waitress and laborer. Tr. 115.  Records of the Social Security Administration reveal that she had employment in the years 1996 ($1690.44), 1997 ($115.56), 2000 ($858.94), 2001 ($6054.98), 2002 ($276.00) and 2003 ($83.70). Tr. 111.  Her total earnings for those years were $9079.62.  Based on the description provided by Stephens, her employment experience consists of unskilled to semi-skilled, light to medium work. Tr. 115 and 136-146.  However, the administrative law judge found that Stephens's work never amounted to substantial gainful activity in light of her minimal earnings and that she had no past relevant work experience.[2] Tr. 17 and 44.  Stephens has not worked since 2003. Tr. 114.

Stephens lives in an apartment with her boyfriend and two children, ages 8 and 10.  Tr. 25 and 125-126.  Her boyfriend works as a laborer for P&M Industries. Tr. 25. Stephens is able to

_____

2.  Past relevant employment in the present case means work performed by Stephens during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

take care of her two children and her personal care. Tr. Tr. 125-
129.  Furthermore, she is able to cook, clean, do laundry and go
shopping. Id.  She stated that she needs no special reminders to
take care of personal needs and grooming or to take medicines; she
is able to drive a motor vehicle and go out alone; she is able to
pay bills, count change, handle a savings account and use a check
book or money orders; and she enjoys reading, watching TV,
drawing, writing and she engages in those activities daily for
"half the day." Id.

On December 18, 2007, Stephens protectively filed[3] an
application for supplemental security income benefits. Tr. 98-105,
110 and 122.  Stephens contends that she became disabled on April
16, 1999, because of chronic pain, lupus, asthma, fatigue,
migraines, depression, anxiety  and memory problems. Tr. 52, 114,
133 and 149.  Stephens's alleged disability onset date of April
16, 1999, has no impact on Stephens's application for supplemental
security income benefits because supplemental security income is a
needs based program and benefits may not be paid for "any period
that precedes the first month following the date on which an
application is filed or, if later, the first month following the
date all conditions for eligibility are met."  See C.F.R. §

---

3.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

416.501.  Consequently, Stephens is not eligible for SSI benefits for any period prior to January 1, 2008.[4]

On May 2, 2008, the Bureau of Disability Determination[5] denied Stephens's application. Tr. 52-56.  On May 28, 2008, Stephens requested an administrative hearing. Tr. 57.  After about 10 months had passed, a hearing was held before an administrative law judge on March 10, 2009. Tr. 19-49.  On March 31, 2009, the administrative law judge issued a decision denying Stephens's application.[6] Tr. 9-18.  On May 7, 2009, Stephens filed a request for review with the Appeals Council. Tr. 4.  On December 10, 2010, after about 19 months, the Appeals Council concluded that there was no basis upon which to grant Stephens's request for review. Tr. 1-3.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Stephens then filed a complaint in this court on January 3, 2011.  Supporting and opposing briefs were submitted and the

---

4.  Furthermore, the burden was on Stephens during the administrative proceedings to prove that she suffered from a disability and our review of the administrative record does not reveal any medical records prior to the year 2005.

5.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for supplemental security income benefits on behalf of the Social Security Administration. Tr. 53.

6.  Stephens was 22 years of age on the alleged disability onset date and only 32 years of age at the time of the administrative law judge's decision.  Stephens is considered a "younger individual" whose age would not seriously impact her ability to adjust to other work.  20 C.F.R. § 416.963(c).

4

appeal[7] became ripe for disposition on July 11, 2011, when
Stephens elected not to file a reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, we have
plenary review of all legal issues decided by the Commissioner.
See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d
Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181
F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d
857, 858 (3d Cir. 1995). However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); Keefe v. Shalala, 71

---

7.  Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176
(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999).  Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213.  In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts
from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.
474, 488 (1971).  A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or

6

fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

7

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims.  See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or

---

8.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

9.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

10.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Stephens's medical records.

The medical records do reveal that Stephens suffered from recurrent neutropenia which is a condition where there is an abnormally low number of neutrophils, a type of white blood cells, which fight infections. Tr. 197, 199,201 229 and 234 322 303. However, no treating of examining physician indicated that this condition caused Stephens to have mental or physical functional limitations.

On August 28, 2006, Stephens had an appointment with Rajan Mulloth, M.D., her primary care physician, regarding a small lump in the left armpit. Tr. 233-236.  Stephens also complained of a flare-up of her allergies and asthma. Id.  Other than a small cyst in the left armpit ("which looked like being secondary to an ingrowing hair"), the results of a physical examination on that date were normal. Tr. 233-234. Stephens had "full joint motion" and "no deformities" in the extremities. Tr. 234. Her deep tendon reflexes, sensation, station and gait were normal. Id.  With respect to her mental status she was "[o]riented in all spheres" and her "affect and mood [were] appropriate." Id.  Dr. Mulloth's assessment was that Stephens suffered from (1) a cyst in the left armpit (because of an ingrowing hair) which was not big enough for incision and drainage and recommended treatment with an

10

antibiotic; and (2) chronic mild persistent asthma and seasonal
allergies and continued her on Albuterol and Claritin. Tr. 235.
Dr. Mulloth further counseled Stephens concerning smoking
cessation and engaging in "occasional-moderate" exercise. Id.  The
record reveals that Stephens smoked between one and two packs of
cigarettes per day. Tr. 168 and 405.

At an appointment with Dr. Mulloth on November 9, 2006,
Stephens reported that she was still smoking, she had no
complaints of depression, she had a good energy level, her
appetite was good, she was sleeping well and her asthma was
stable. Tr. 230.

On November 27, 2006, Stephens reported that she was
smoking one pack a day and unable to quit. Tr. 226.  When Dr.
Mulloth conducted a review of Stephens's systems[12] Stephens
denied, *inter alia*, the following: fever, chills, sweats,
weakness, malaise, vision loss, blurry vision, chest pain, back
pain, joint pain, joint swelling, muscle cramps, muscle weakness,
stiffness, arthritis, sciatica, restless legs, leg pain at night,
leg pain with exertion, paresthesias,[13] seizures, tremors,

---

12.  "The review of systems (or symptoms) is a list of questions,
arranged by organ system, designed to uncover dysfunction and
disease." A Practical Guide to Clinical Medicine, University of
California, School of Medicine, San Diego, http://meded.ucsd.edu/
clinicalmed/ros.htm (Last accessed February 29, 2012).

13.  Paresthesia is a sensation of tingling, prickling, or
numbness of the skin, more generally known as the feeling of pins
and needles. See Dorland's Illustrated Medical Dictionary, 1232
(continued...)

vertigo, frequent headaches, difficulty walking, depression, anxiety, memory loss, confusion and cold intolerance. Tr. 227. The results of a physical examination were essentially normal, including she had normal deep tendon reflexes, sensation, station and gait. Tr. 227-228.  Her mood and affect were appropriate. Id. Dr. Mulloth noted that she had chronic asthma and recommended smoking cessation. Tr. 229.

On March 20, 2007, Stephens had an appointment with Dr. Mulloth at which she complained of severe neck pain. Tr. 220. Dr. Mulloth noted that Stephens "twisted [her] neck while shoveling snow[.]" Id.  Dr. Mulloth further stated in the report of this appointment that Stephens's asthma was "under good control" and that he advised Stephens that her "recent symptoms may also be related to cigarette use." Id.  The results of a physical examination were essentially normal. Id.  Stephens was neurologically intact; her deep tendon reflexes were normal; she hand normal sensation, station and gait; she was oriented to person, place and time; and her affect and mood were appropriate. Id.  Dr. Mulloth's assessment, *inter alia*, was that she suffered from acute neck pain/torticollis[14] and prescribed medications;

---

13.  (...continued)
(27th Ed. 1988).

14.  Torticollis is defined as "wryneck; a contracted state of the cervical muscles, producing twisting of the neck and an unnatural position of the head." Dorland's Illustrated Medical Dictionary, 1734 (27th Ed. 1988).

stable chronic neutropenia; and stable mild to moderate asthma. Tr. 221.

At an appointment with Dr. Mulloth on May 7, 2007, Stephens complained of a "4 day history of spasms and pain starting on [right] side of [her] neck and extending down into [her] back, arm and chest." Tr. 217.  Stephens was diagnosed with torticollis, a stiff neck. Tr. 218. Dr. Mulloth prescribed Skelaxin, a muscle relaxant,[15] and the steroid anti-inflammatory drug Medrol.[16]

At an appointment with Dr. Mulloth on December 26, 2007, the results of a physical examination were essentially normal, including normal station and gait, full joint motion in her extremities,  and her affect and mood were appropriate. Tr. 405-406.  Stephens did have spasms in the trapezius and scalene muscles on the right side of the neck and rotation range of motion of the neck was nearly 0 percent. Tr. 406. Stephens had no psychological complaints.  She further indicated that her energy and appetite were good and that she was sleeping well. Tr. 405. Stephen was still smoking between one and two packs of cigarettes per day. Id.

A musculoskeletal physical examination of Stephens by Julio A. Ramos, M.D., of Professional Orthopaedic Associates,

---

15.  Skelaxin, Drugs.com, http://www.drugs.com/skelaxin.html (Last accessed February 29, 2012).

16.  Medrol, Drugs.com, http://www.drugs.com/mtm/medrol.html (Last accessed February 29, 2012).

Ltd., on February 6, 2008, revealed "no obvious synovitic changes, range of motion limitation, or effusion" and "[m]ild tenderness of the cervical and thoracolumbar spine[.]" Tr. 291.  At this appointment Stephens complained of fatigue and "history of occasional myoclonic jerks."[17] Tr. 290. Stephens was still smoking "approximately one pack per day previously approximately two packs per day since the age of 18." Id.  Dr. Ramos advised Stephens to quit smoking and ordered blood tests. Tr. 291.

At a follow-up appointment on February 28, 2008, Stephens complained of "intermittent shooting pain of her neck and lower back." Tr. 402.  Dr. Ramos noted that the results of the blood work "showed no evidence of inflammatory disease."[18] Id. Dr. Ramos's physical examination of Stephens revealed the following: "[V]ital sign afrebrile [no fever]. Blood pressure 136/80, pulse 70, and respirations 22. [Head, eyes, ears, nose,

---

17.  A myoclonic jerk is an involuntary twitching of a muscle or muscle group, e.g., hiccups which are caused by involuntary contractions of the muscles of the diaphragm. Myoclonus, Definition, Mayo Clinic staff, http://www.mayoclinic.com/ health/myoclonus/DS00754 (Last accessed February 29, 2012).

18.  An ANA blood test (anti-nuclear antibody blood test) in November, 2008, was negative. The ANA antibodies are found in 97 percent of the people who have lupus but a positive ANA test does not mean that an individual suffers from Lupus. Laboratory Tests for Lupus, Lupus Foundation of America,http://www.lupus.org/ webmodules/webarticlesnet/templates/new_learndiagnosing.aspx?arti cleid=2242&zoneid=524 (Last accessed February 29, 2012). The blood tests ordered by Dr. Ramos – C3 and C4 complement levels, anticardiolipin antibodies, Smith and RNP and double stranded DNA antibodies –  were to determine if Stephens suffered from lupus. Id.; see also Diagnosing Lupus, About.com, http://lupus.about.com /od/diagnosisandtreatments/p/LupusDiagnosis.htm (Last accessed February 29, 2012).

throat] normal. Neck normal. Chest normal. Heart normal. Abdomen
normal. Musculoskeletal, trace synovitic changes of the MCP joints
2, 3, 4 and 5 bilaterally[19] as well as bilateral wrist
tenderness.  No synovitic changes. The rest of the joints are
intact. She does have mild tenderness of the cervical and lumbar
spine." Id.  Dr. Ramos stated that Stephens had mild neutropenia,
asked her quit smoking, and in light of the synvotic changes and a
slightly elevated sedimentation rate[20] "elected to try empirically
Plaquenil[.]"[21]

    Although Stephens alleged that she had lupus, her
treating physicians never received prior medical records from
California confirming that diagnosis. Tr. 168, 291, 402 and 436.
The treating physicians noted her alleged history of lupus, but

------------------------------------------------------------

19.  Trace synovitic changes refers to a small amount of
inflammation of the membrane surrounding MCP joints.  The MCP
(metacarpophalangeal) joints  are the knuckles of the hands.

20.  According to the Mayo Clinic's website the

            [s]ed rate, or erythrocyte sedimentation rate (ESR),
            is a blood test that can reveal inflammatory activity
            in your body.  A sed rate test isn't a stand-alone
            diagnostic tool, but the result of a sed rate test may
            help your doctor diagnose or monitor an inflammatory
            disease.

Sed rate (erythrocyte sedimentation rate), Definition, Mayo
Clinic staff, http://www.mayoclinic.com/health/sed-rate/MY00343
(Last accessed February 29, 2012)). ).

21.  Plaquenil is a drug used to treat malaria. It also is used
to treat symptoms of rheumatoid arthritis and lupus. Plaquenil,
Drugs.com, http://www.drugs.com/plaquenil.html (Last accessed
February 29, 2012).

consistently assessed that it was stable and/or in remission throughout the relevant time period.  Tr. 211, 226, 228, 327, 433 and 453.

On June 10, 2008, Dr. Mulloth noted that Stephens's lupus was stable. Tr. 453.  The results of a physical examination on that date were essentially normal, including full joint range of motion in the extremities and a normal gait. Tr. 454.

On November 6, 2008, while Stephens was hospitalized for an acute peritonsillar abscess she was examined by Dr. Ramos. Tr. 435-437. Dr. Ramos in the report of that examination states in pertinent part as follows: "Ms. Tamara Stephens is a 31-year-old female whom I have seen in the office several times. She has an unclear diagnosis of systemic lupus erythematosus based on a hematologic workup done out of state. . . I have not yet to obtain data to suggest that this was the case. . . Through multiple evaluations, I have not yet found a significant serologic abnormality with the exception of a persistent elevation of her sedimentation rate. She was advised of this and was placed on anti-inflammatories. . . I see no evidence for underlying connective tissue disease." Tr. 435-436.  Stephens was discharged from the hospital on November 7, 2008, and was seen by Anthony C. Brutico, M.D., at his office in Olyphant, to have the throat abscess incised and drained. Tr. 441 and 444.  However, very little pus was found when an attempt was made to drain the abscess. Id.  Stephens was advised to continue taking the

16

antibiotic clindamycin. Id. At a follow-up appointment with Dr. Brutico on November 12, 2008, Stephens reported that she was doing much better on just antibiotics. Tr. 445. An examination of her throat revealed "almost complete resolution of her right peritonsillar swelling." Id. Stephens informed Dr. Brutico of "a strong history of recurrent tonsillitis going back to childhood." Id. Dr. Brutico recommended that she have a tonsillectomy. Id. There is no indication that Stephens followed through with that recommendation.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Stephens had not engaged in substantial gainful work activity since December 18, 2007, the protective filing date of the application. Tr. 11.

At step two of the sequential evaluation process, the administrative law judge found that Stephens had the following severe impairments: "neutropenia, systemic lupus erythematosus (SLE) history, recurrent tonsillitis, obesity, asthma, headaches, back impairment, and neck impairment." Tr. 11-13. The administrative law judge found that Stephens's mental impairments were non-severe because they did not cause more than minimal limitations in the claimant's ability to perform basic work activities. Tr. 13.

At step three of the sequential evaluation process the administrative law judge found that Stephens's impairments did not

17

individually or in combination meet or equal a listed impairment.
Tr. 13-14.

At step four of the sequential evaluation process the
administrative law judge found that Stephens had no past relevant
work and had the residual functional capacity to perform light
work as defined in the regulations except she "cannot tolerate
concentrated exposure to fumes, odors, dusts, gases, or poor
ventilation" and she is "nonexertionally limited to routine
repetitive tasks." Tr. 14-16. In setting this residual functional
capacity, the administrative law judge relied on the opinions of
Mary Ryczak, M.D., and Dennis C. Gold, Ph.D., a psychologist, both
who reviewed Stephens's medical records on behalf of the Bureau of
Disability Determination in April, 2008. Tr. 382-400.  Dr. Ryczak
concluded that Stephens had the physical exertional abilities to
engage in a limited range of light work consistent with the
administrative law judge's determination. Tr. 396-399.  Dr. Gold
found that Stephens had mild restrictions of activities of daily
living, mild difficulties in maintaining social functioning, and
mild difficulties in maintaining concentration, persistence or
pace. Tr. 392.

Based on the above residual functional capacity and the
testimony of a vocational expert the administrative law judge at
step five of the sequential evaluation process found that Stephens
could perform unskilled, light work as a janitor, cafeteria
attendant, usher/ticket taker, and inspector, and that there were

a significant number of such jobs in the regional and national economies. Tr. 17 and 44-47.

The administrative record in this case is 456 pages in length, primarily consisting of medical and vocational records. Stephens makes the following arguments: (1) the administrative law judge should have consulted a medical advisor to assess whether Stephens's mental impairments met the requirements of a Listed impairment; (2) the administrative law judge improperly assessed Stephens's credibility; (3) the administrative law judge improperly considered medical opinions; and (4) the administrative law judge failed to properly formulate Stephens's residual functional capacity.

We have thoroughly reviewed the record in this case and find no merit in Stephens's arguments. The administrative law judge did an excellent job of reviewing Stephens's vocational history and medical records in his decision. Tr. 9-18. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant.  Because the administrative law judge adequately reviewed the medical evidence in his decision we will only comment on a few additional items.

Initially we will note that no treating or examining physician has indicated that Stephens suffers from physical or mental functional limitations that would preclude her from engaging in the limited range of unskilled, light work set by the

19

administrative law judge in his decision for the requisite
statutory 12 month period.

At step two the administrative law judge found that
Stephens's mental impairments were non-severe.  That conclusion is
supported by the "Psychiatric Review Technique" form completed by
Dr. Gold, the fact that Stephens was not taking medications for
anxiety or depression, and the unremarkable mental status findings
of her primary care physician, Dr. Mulloth. Tr. 209, 220, 382 and
453.

The administrative law judge relied on the opinions of
Dr. Ryczak, the state agency physician, and Dr. Gold, the state
agency psychologist. The administrative law judge's reliance on
the opinions Dr. Ryczak and Dr. Gold was appropriate. See Chandler
v. Commissioner of Soc. Sec.,__F.3d.__, 2011 WL 6062067 at *4 (3d
Cir. Dec. 7. 2011)("Having found that the [state agency
physician's] report was properly considered by the ALJ, we readily
conclude that the ALJ's decision was supported by substantial
evidence[.]").

We are satisfied that the administrative law judge
appropriately took into account all of Stephens's mental and
physical limitations in the residual functional capacity
assessment. The administrative law judge concluded that Stephens
could engage in a limited range of light work.  That conclusion is
supported by the opinion of the state agency physician and the
opinion of the state agency psychologist.

The administrative law judge stated that Stephens's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, light work. Tr. 15.  The administrative law judge was not required to accept Stephens's claims regarding her physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge heard Stephens testify, the administrative law judge is the one best suited to assess the credibility of Stephens.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


_____  S/Richard P. Conaboy
                          RICHARD P. CONABOY
                          United States District Judge


Dated: March 2, 2012

22